**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RANDOLPH QUINTAL,**<br>**Plaintiff,**<br><br>**v.**<br><br>**PENNSYLVANIA STATE POLICE, CHRISTOPHER ABBOTT, JARRED BURNETT, and CHRISTOPHER ADAMS,**<br>**Defendants.** | **CIVIL ACTION**<br><br>**NO. 24-2385** |

# MEMORANDUM

**HODGE, J.** **August 5, 2026**

## I. INTRODUCTION

In this action, Plaintiff Randolph Quintal ("Plaintiff") asserts state law negligence claims against the Pennsylvania State Police (the "PSP"), PSP Trooper Christopher Abbott ("Abbott"), and Christopher Adams ("Adams") (Counts I, III, IV), as well as substantive due process claims under 42 U.S.C. § 1983 against Abbott and PSP Trooper Jarred Burnett ("Burnett," and together with Abbott, the "Troopers") (Counts V, VI). (ECF No. 1.) Plaintiff's claims arise out of a vehicle pursuit by the Troopers of Adams, which concluded after Adams's vehicle collided with Plaintiff's vehicle, leaving Plaintiff severely injured. (*Id.*) Defendants PSP and the Troopers (collectively, "Commonwealth Defendants") moved for summary judgment on both the state law negligence claims and the § 1983 claims. (ECF No. 44 (the "Motion").) Plaintiff opposed Commonwealth Defendants' Motion (ECF No. 52 (the "Response")), and Commonwealth Defendants submitted a reply brief in support of the Motion (ECF No. 55).

For the reasons that follow, Commonwealth Defendants' Motion is granted as to the § 1983 claims. With the dismissal of all federal claims in this lawsuit, pursuant to 28 U.S.C. § 1367(c)(3),

this Court declines to exercise supplemental jurisdiction over the remaining state law negligence claims. Thus, the state law claims are dismissed without prejudice.

## II. BACKGROUND

### A. Factual Background[1]

The following facts are either undisputed or are otherwise supported by the record. On March 6, 2023, Troopers Abbott and Burnett were working together as partners riding in a marked PSP vehicle, with Abbott driving and Burnett sitting in the front passenger seat. (SUMF (Commonwealth Defendants' Statement of Undisputed Material Facts ("SUMF")) ¶¶ 1–3; ECF No. 52 (Plaintiff's Response to Defendant's Statement of Facts ("RSF") ¶¶ 1–3.) Abbott and Burnett testified that, while patrolling the Borough of Pottstown, they observed a black Chevrolet Malibu turn the wrong way down a one-way street, then travel down the street before reversing and backing out into the road it had been traveling on. (ECF No. 44-2 at 9 (25:16–24), 28 (26:4–27:3).) The driver of the Malibu, Adams, testified that he did not drive the wrong way down the one-way street. (RSF ¶ 4; ECF No. 52-3 at 15–16 (14:16–15:7).)

At approximately 1:20 a.m., Abbott and Burnett activated their emergency lights and sirens and pulled the Malibu over for a traffic stop on Franklin Street. (SUMF ¶ 6; RSF ¶ 6.) Burnett approached the vehicle's front passenger window, observed two people in the car, and began to introduce himself. (SUMF ¶ 6; RSF ¶ 6.) As Burnett was introducing himself, Adams sped away. (SUMF ¶ 6; RSF ¶ 6.) The Troopers kept their vehicle's lights activated during the traffic stop, and once Adams sped off, the Troopers activated their vehicle's sirens again and initiated a pursuit. (ECF No. 44-2 at 43 (Mobile Vehicle Recorder Footage ("MVR Footage")) at 1:34.)[2] Within approximately the first twenty-three seconds of the chase, Adams ran four stop signs and a red

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.
[2] The Court refers to the timestamps provided on the MVR footage provided by Defendants.

light. (*Id.* at 1:34–1:57.) Abbott testified that he chose to pursue the vehicle because it fled the traffic stop, and the danger posed by Adams to the public was unknown at that point since the Troopers were unable to identify him before he fled. (ECF No. 44-2 at 29 (31:6–7), 34 (51:7–52:5).)

Burnett testified that at the early stages of the pursuit, he said to Abbott, "it's on baby, let's go." (ECF No. 52-4 at 11–12 (40:13-41:18).) During the pursuit, Burnett apprised his supervisor of traffic and pedestrian conditions. (MVR Footage at 2:20–24 ("light traffic, no traffic at all, no pedestrian traffic on industrial"); *id.* at 4:13 ("no traffic"); *see also id.* at 11:35, 12:30, 13:37, 14:28, 16:04.) Abbott also radioed during the pursuit to request assistance from additional officers from the Philadelphia PSP barracks as well as local police. (SUMF ¶ 15; RSF ¶ 15.) No other officers, from PSP or otherwise, responded to Abbott's radio requests during the pursuit. (SUMF ¶ 15; RSF ¶ 15.)

Adams drove through the Borough of Pottstown, traveling south on North Franklin Street, where he failed to yield or slow down at multiple stop signs. (MVR Footage at 1:30–2:21.) Abbott testified that he did not consider terminating the pursuit in the Borough of Pottstown because there was no vehicular or pedestrian traffic. (ECF No. 44-2 at 31 (40:15–16).) Adams then turned left onto the eastbound side of Industrial Highway, traveling at approximately sixty-five miles per hour,[3] and eventually entered onto US 422 eastbound, increasing his speed to eighty-five miles per hour.[4] (SUMF ¶¶ 18–19; RSF ¶¶ 18–19.) During the pursuit on US 422, Adams turned off the

---

[3] This Court takes judicial notice that the official speed limit on Industrial Highway in the Borough of Pottstown is forty miles per hour. Borough of Pottstown Municipal Code, Traffic Regulations, Ch. 15 § 201; *see* Fed. R. Civ. P. 201; *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001).

[4] This Court takes judicial notice that the official speed limit on US 422 is fifty-five miles per hour. Pennsylvania Department of Transportation, Locations, Pennsylvania's Work Zone Speed Safety Cameras, https://workzonecameras.penndot.gov/locations/.

Malibu's front and rear lights, and Adams and the Troopers increased their speeds to between approximately 110 and 120 miles per hour. (SUMF ¶¶ 21–22; RSF ¶¶ 21–22.) There was light traffic on US 422 during the pursuit. (SUMF ¶ 22; RSF ¶ 22.) Adams then exited US 422 onto Egypt Road and subsequently entered the Borough of Norristown. (SUMF ¶ 24; RSF ¶ 24.)

While exiting US 422, Burnett and Abbott radioed their supervisor asking for permission to conduct a precision immobilization technique ("PIT") maneuver, whereby a police vehicle attempts to stop a fleeing vehicle by making contact with it to cause the fleeing vehicle to spin in a controlled manner and come to a stop. (SUMF ¶¶ 25–26; RSF ¶¶ 25–26.) Abbott and Burnett's supervisor authorized them to conduct a PIT maneuver if they deemed it safe to do so, but ultimately the Troopers never attempted one. (SUMF ¶ 27; RSF ¶ 27.) Abbott and Burnett's supervisor never ordered them to terminate the pursuit. (SUMF ¶ 36; RSF ¶ 36.) Burnett admitted that he never considered terminating the pursuit, despite Adams's increasingly dangerous conduct as the chase ensued. (ECF No. 52-4 at 10 (34:8–35:19).)

The chase continued through the Borough of Norristown, with Adams and the Troopers traveling approximately fifty to sixty miles per hour and Adams driving with the Malibu's front and rear lights turned off. (SUMF ¶¶ 24, 28–29; RSF ¶¶ 24, 28–29.) Adams then entered the intersection of Wood and Markley Streets in the Borough of Norristown with his lights off and failed to stop at the stop sign. (SUMF ¶ 31; RSF ¶ 31.) As Adams entered the intersection, the Malibu was struck on its passenger side by a vehicle driven by Plaintiff, who was traveling north on Markley Street. (MVR Footage at 16:55; ECF No. 44-2 at 73.) Plaintiff had the right of way.[5]

[5] Plaintiff articulates a conflicting account of the collision in his Response, stating that "Mr. Adams t-boned Mr. Quintal's car while crossing a red light at a four-way controlled intersection." (Response at 18.) Upon review of the MVR Footage, the intersection was a two-way where Adams failed to stop at a stop sign and collided with Plaintiff, who had the right of way driving on the throughway. (MVR Footage at 16:55.)

(MVR Footage at 16:55.) In total, the chase lasted approximately fifteen minutes and twenty-eight seconds and spanned multiple boroughs and a variety of different roads. (*See generally id.*)

After the collision, Adams took off on foot and Abbott pursued him. (SUMF ¶ 32; RSF ¶ 32.) The passenger of the Malibu exited the vehicle and immediately fell to the ground. (MVR Footage at 17:13.) Burnett took the passenger into custody. (SUMF ¶ 33; RSF ¶ 33.) Another police vehicle arrived on the scene approximately twenty-one seconds after the collision, and the officer from the second police unit approached Plaintiff's vehicle and tried unsuccessfully to open Plaintiff's door. (SUMF ¶ 34; RSF ¶ 34.) After another failed attempt to open Plaintiff's door, the officer radioed for Fire/EMS. (SUMF ¶ 34; RSF ¶ 34.) Once EMS arrived, about five-and-a-half minutes after the collision, Plaintiff was extricated from his vehicle by the fire department and taken to the hospital with serious injuries. (SUMF ¶¶ 34–35; RSF ¶¶ 34–35.)

Adams testified that after the Troopers arrested him, during his transport they showed him videos from their cellphones of two prior high-speed pursuits they were involved in that resulted in car accidents, as well as a video from their chase of Adams that morning. (ECF No. 52-3 at 18 (17:1–15).) Adams also testified that the Troopers bragged that nobody got away from them and "they catch everybody and if they gotta flip a car in the process or whatever that's what they'll do." (*Id.*) Adams testified that the "demeanor of the officers" as they told him this information was that they got a "thrill out of it." (*Id.* at 22 (21:2–6).)

Trooper Burnett later secured a search warrant for Adams's vehicle, where he found and seized 197 vials of crack cocaine, twenty-nine packets of heroin, and twenty containers of marijuana. (ECF No. 44-2 at 50.) Additionally, Adams dropped a Glock 44 handgun when he exited his vehicle immediately following the collision. (*Id.*)

Following the events of March 2, 2023, the PSP conducted an internal investigation into the pursuit and collision. (ECF No. 44-2 at 44–124.) The Internal Affairs Division Investigator, Sergeant Stefano N. Gallina, reviewed evidence which included, among other things, Computer Aided Dispatch recordings and associated GPS data, radio transmissions, the crash report, the police report associated with Adams's subsequent criminal charges, MVR footage, photographs, and interviews with Abbott and Burnett. (*Id.* at 45–47.) PSP determined that the pursuit by Troopers Abbott and Burnett, as well as the force used to take Adams and his passenger into custody, were justified under PSP policies and procedures. (ECF No. 44-2 at 127–28.)

### B. Procedural History

On June 3, 2024, Plaintiff commenced this action by filing his Complaint in this Court, naming the PSP, Abbott, Burnett, Adams, and Kristen Phillips ("Phillips") as Defendants. (ECF No. 1.) Plaintiff brought negligence claims against the PSP, Adams, Phillips, Abbott, and Burnett jointly and severally. (ECF No. 1 at 7–13.) In addition, Plaintiff brought claims under 42 U.S.C. § 1983 against Abbott and Burnett in their individual and official capacities. (*Id.* at 13–19.)

Following a stipulation by the parties, this Court dismissed all claims against Phillips (Count II) without prejudice on November 17, 2025. (ECF No. 37.) On January 29, 2026, the Commonwealth Defendants and Plaintiff stipulated to dismissal of Plaintiff's negligence claim against Burnett only (Count IV), as well as dismissal of Plaintiff's Excessive Force and Assault and Battery claims against Abbott and Burnett in their individual and official capacities in their entirety (Counts VII and VIII). (ECF No. 43.) Accordingly, Plaintiff's remaining claims against Commonwealth Defendants include a negligence claim against Defendant PSP (Count III), a negligence claim against Abbott only (Count IV), and § 1983 substantive due process claims

against Troopers Abbott and Burnett in their individual capacities (Counts V and VI).[6] (*Id.*) Plaintiff's negligence claim (Count I) against Adams also remains but is not the subject of the current Motion.

On February 17, 2026, this Court appointed Dolores Vazquez as Plaintiff's Guardian Ad Litem, granting her authority to act on Plaintiff's behalf in all matters relating to this action. (ECF No. 47.) On February 5, 2026, Commonwealth Defendants filed a Motion for Summary Judgment. (ECF No. 44.) Plaintiff filed his Response on March 16, 2026. (ECF No. 52.) Commonwealth Defendants filed their reply on March 30, 2026. (ECF No. 55.)

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those which might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" where the evidence is such that a reasonable jury could find for the nonmoving party. *Id.* After the movant has met its initial burden, the non-movant's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1).

If the non-movant fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

[6] As noted in this Court's January 29, 2026 Order, Plaintiff agreed to withdraw his claim against Abbott and Burnett for procedural due process violations. (*Id.*)

of proof at trial," summary judgment is warranted. *Celotex*, 477 U.S. at 322. A plaintiff cannot withstand a motion for summary judgment by merely restating the allegations of the complaint, rather the plaintiff "must point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995).

## IV. DISCUSSION

### A. Section 1983 Claims (Counts V and VI)

42 U.S.C. § 1983 provides for a cause of action against officials who, under color of state law, deprive another person of rights secured by the Constitution or federal law. Qualified immunity provides an affirmative defense for officials sued in their individual capacity under § 1983 so long as the officials' "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether the defense of qualified immunity applies, a court must decide (1) whether the plaintiff has shown a violation of a federal right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court may consider these issues in any order, and a plaintiff's failure to establish either issue will entitle a defendant to immunity. *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009). "On a motion for summary judgment asserting the defense of qualified immunity, the plaintiff bears the initial burden to show that the defendant's conduct violated the plaintiff's clearly established right." *Verdier v. Borough*, 796 F. Supp. 2d 606, 630 (E.D. Pa. 2011) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997)).

Commonwealth Defendants assert they are entitled to qualified immunity. To assess whether qualified immunity applies, the Court will look first to whether Plaintiff has shown that Commonwealth Defendants violated a constitutional right.

### 1. Constitutional Violation

Here, Plaintiff brings his § 1983 claims against Abbott and Burnett under the theory that they violated his Fourteenth Amendment substantive due process rights by causing a "state-created danger." The state-created danger theory of § 1983 liability put forth by Plaintiff "embodies the principle that the government has an obligation under the Fourteenth Amendment's Due Process Clause 'to protect individuals against dangers that the government itself creates.'" *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018) (quoting *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018)). A claim under the state-created danger doctrine requires the plaintiff to demonstrate the following elements:

> (1) [t]he harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (citing *Haberle*, 885 F.3d at 176–77). Commonwealth Defendants only dispute the existence of the second factor in their Motion. (Motion at 6–11; *see* Response at 17–18.)

The Third Circuit has found that an officer's culpability "turns on timing—the less time an officer has to act, the less blameworthy a flawed decision is." *Otero v. Kane*, 161 F.4th 189, 192 (3d Cir. 2025). The court recognized three "categories of culpability" to determine when a police chase may violate a bystander's Fourteenth Amendment due process rights:

> (1) If the situation was "hyperpressurized," requiring "split-second decisions," the officer is not liable unless he intended to harm.

> (2) If the situation gave the officer hours or minutes to engage in "hurried deliberation," the officer is not liable unless he "consciously disregarded . . . a great risk of serious harm."
>
> (3) If the situation was "unhurried" and left time for "careful deliberation," the officer can be liable if he was "deliberately indifferent" to the risk of harm.

*Id.* Courts in the Third Circuit begin to run the clock for how long the officer had to act by looking to when "an event occurs that requires officers to decide whether to pursue a suspect *dangerously*." *Id.* at 193.

To assess whether a constitutional violation occurred, this Court must first determine which category of culpability under *Otero* the Troopers' conduct falls under. Plaintiff contends that the Troopers' conduct falls into *Otero*'s second category because they had "ample time to assess the situation and decide to discontinue the pursuit of Mr. Adams" while they "aggressively chased Mr. Adams for approximately 20 minutes." (Response at 20–23.) Commonwealth Defendants argue that this case falls into category one because it is "vastly similar" to the facts in *Otero*—a category one case where the officers pursued a fleeing suspect who, once the chase began, ran a red light, exceeded the speed limit, turned the wrong way down a one-way street, and ran another red light, crashing into another car. (*See* Motion at 7–8); *Otero*, 161 F.4th at 191–92, 194.

As discussed *supra*, the clock to determine the culpability of the officers begins to run when "an event occurs that requires officers to decide whether to pursue a suspect *dangerously*." *Otero*, 161 F.4th at 193. In this case, Adams drove away from the officers as they approached his vehicle after they had pulled him over. Adams then ran his first stop sign within seconds of fleeing the traffic stop. At that point in time, the Court finds that the Troopers made a "split-second" decision to pursue Adams dangerously by also driving through stop signs, placing them in *Otero*'s first culpability category. However, the analysis does not end there. The *Otero* court recognized that the "officers' chase, especially the dangerous part of it, was brief"; after the suspect ran his first red light, the chase itself "covered less than half a mile and ran less than a minute" until the

suspect crashed into another driver. *Id.* at 192, 194. Here, the chase and its dangerous character continued for over fifteen minutes. The Court does not accept Defendant's argument that the clock determining culpability "does not restart once a pursuit is underway." (ECF No. 55 at 3–4.) By this logic, a pursuit could continue indefinitely under an "intent to harm" standard of culpability, so long as the pursuit initially involved a "split-second decision." This Court finds that as the chase went on and the Troopers had more time to deliberate, the applicable culpability level changed from the first *Otero* category to the second category.

The Third Circuit recently analyzed whether the culpability of an officer changed during a high-speed pursuit in *Miller v. Wolk*, No. 24-1863, 2026 WL 1587518 (3d Cir. June 3, 2026). In *Miller*, a police officer witnessed a fifteen-year-old commit minor traffic infractions while driving a motorized scooter and initiated a high-speed chase through a densely populated residential neighborhood. *Id.* at *1. The pursuit lasted approximately two minutes and resulted in the motor scooter driver running through a red light and fatally colliding with a tractor-trailer. *Id.* The *Miller* Court held that the timeframe for assessing culpability began to run when the motor scooter driver decided to speed away from the officer, leaving the officer to make an "instantaneous" decision whether to pursue, placing the officer in the "intent to harm" culpability category. *Id.* at *3. The court found that this same culpability continued throughout the two-minute high-speed chase because the officer "remained within a rapidly developing environment" in which he did not have the opportunity for "hurried deliberations." *Id.* Therefore, the court's assessment of the relevant culpability category did not change based on the duration of the chase.

This Court finds that the facts in *Miller* are distinguishable from the facts at hand and here the Troopers' culpability level did change as the pursuit continued. Although the Troopers had to make a "split-second decision" about whether to get back in their vehicle and pursue Adams the

moment that he sped away and ran his first stop sign, the Court is unconvinced that the Troopers continued to face such a "hyperpressurized" situation in which they had no time for "hurried deliberations" throughout the entire course of the fifteen minute and twenty-eight second chase. Rather, the Court is persuaded that the Troopers had time for and did engage in "hurried deliberations" throughout the course of the chase, as exhibited by the Troopers' ability to apprise their supervisor of traffic and pedestrian conditions throughout the duration of the chase on at least seven occasions, their radioed request for additional assistance from the Philadelphia PSP barracks and local police, and their request for authorization to conduct a PIT maneuver. These facts show that the Troopers had time to consider their decision to continue to chase Adams and reevaluate their strategy as time went on. Indeed, these facts, as reflected by the Troopers' repeated assessment of the situation, are akin to those in *Sauers*, where the Third Circuit determined that the officer had time for "hurried deliberations" when he called and spoke with the neighboring police department during his pursuit of the traffic offender. 905 F.3d at 718. Because the developing situation and prolonged nature of the chase here allowed time for hurried deliberations, the Troopers' conduct at the time of Adams's collision with Plaintiff falls into the second category of culpability.

Turning to whether the Troopers' had the requisite culpability under *Otero*'s second category, the Court finds that Plaintiff has demonstrated, for purposes of the qualified immunity inquiry, that the Troopers acted with conscious disregard of a great risk based on both their conduct and statements. Logic counsels that had the Troopers decided to terminate their pursuit, Adams would not have had a reason to continue to evade traffic laws to escape them. But instead, the Troopers chose to continue pursuing Adams even though he posed a great risk to any pedestrians and other drivers as he sped through stop signs and red lights, drove with his headlights off, and

exceeded the speed limit by upwards of fifty-five miles per hour. Burnett admitted during his deposition that he never considered terminating the pursuit, even as Adams's driving became more dangerous. The Troopers' statements to Adams after the pursuit also evince a callous disregard for the risk of harm their pursuit created. Indeed, the Troopers bragged to Adams about previous pursuits, stating that no one got away from them, and they catch "everybody," even "if they have to flip a car in the process." (ECF No. 52-3 at 18 (17:1–15).) In short, the Troopers exhibited a conscious disregard of a great risk to the public by choosing to pursue a potential traffic offender through multiple boroughs for over fifteen minutes, exceeding the speed limit by upwards of fifty-five miles per hour.

**2. Clearly Established Law**

Despite finding that Plaintiff has successfully demonstrated a constitutional violation occurred, the Court finds that the constitutional right was not "clearly established" at the time of the offense. Clearly established rights must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635 (1987). The dispositive inquiry is whether the state of the law at the time of the alleged violation provided the Troopers "fair warning" that their conduct constituted a violation of Plaintiff's constitutional rights. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Plaintiff relies on *Sauers v. Borough of Nesquehoning* as "clearly establishing" that his constitutional right was violated. (Response at 26.) Although this Court finds that *Sauers* does have some factual similarities, as discussed *supra*, the Court concludes that *Sauers* is ultimately distinguishable from the present case because in *Sauers* the officer had time for hurried deliberation throughout the entirety of the pursuit. 905 F.3d at 718. In *Sauers*, the defendant police officer observed the driver of a Dodge commit a summary traffic offense. *Id.* at 715. Based solely

on that observation, the officer turned around and began to pursue the Dodge. *Id.* During his pursuit, the officer radioed ahead to the police in the neighboring borough to request that they pull the Dodge over once it reached their jurisdiction. *Id.* However, still seeking to apprehend the Dodge's driver himself, the officer commenced a high-speed chase, reaching speeds of over 100 miles per hour to catch up to the Dodge. *Sauers v. Homanko*, No. 3:16CV811, 2017 WL 590273, at *1 (M.D. Pa. Feb. 14, 2017). While driving around a curve in the course of his pursuit, the defendant officer lost control of his police car. *Sauers*, 905 F.3d at 715. The officer's car began to spin, crossed the center line into traffic traveling the opposite direction, and crashed into Sauers's car. *Id.*

The Third Circuit found that the fact pattern in *Sauers* fell into the second category of culpability because the officer had "at least some time to deliberate before deciding whether and how to pursue the traffic offender." *Id.* at 718 (citation modified). This stands in contrast to the circumstances here, where the Troopers had to make a quick decision initially whether to pursue Adams as he actively fled the traffic stop. The Third Circuit defined the right at issue in *Sauers* "as one not to be injured or killed as a result of a police officer's reckless pursuit of an individual suspected of a summary traffic offense when there is no pending emergency *and when the suspect is not actively fleeing the police*." *Id.* at 717 (emphasis added). Thus, the *Sauers* court explicitly cabined their holding to situations in which a suspect is *not* actively fleeing. *See Miller v. Wolk*, No. CV 20-6301, 2024 WL 1604003, at *9 (E.D. Pa. Apr. 12, 2024) (explaining that "the *Sauers* test is conjunctive" and therefore only met where there is no pending emergency *and* when the suspect is not actively fleeing the police), *aff'd*, No. 24-1863, 2026 WL 1587518 (3d Cir. June 3, 2026). Because Adams was actively fleeing the Troopers, the right defined in *Sauers* did not clearly put the Troopers on notice that their conduct was unconstitutional.

Plaintiff maintains that officials can still be on notice that their conduct is unlawful even in novel factual circumstances. (Response at 25 (citing *Hope*, 536 U.S. at 741).) While it is true that, under *Hope*, a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,'" that principle is inapplicable where, as here, the case law has been highly refined. Here, the Third Circuit has defined the contours of the "general constitutional rule" promulgated by the Supreme Court in 1998 in *County of Sacramento v. Lewis* that a police officer may violate the substantive due process rights of a third party injured in a vehicular pursuit if the officer's culpability "shocks the conscience." 523 U.S. 833 at 846–47 (1998). It is not enough for Plaintiff to argue that this Court must revert back to that broad principle when the case law has since defined with particularity the levels of culpability that are "conscience shocking" based on the timing of the officers' decisions.

Although the Court finds that a constitutional violation occurred here, Plaintiff has not carried his burden to show that Commonwealth Defendants' conduct violated a clearly established right. Therefore, Commonwealth Defendants are entitled to qualified immunity for Plaintiff's § 1983 claims.

### B. State Law Negligence Claims (Counts I, III, and IV)

Excluding the § 1983 claims, which are the only federal claims presented in the Complaint, the sole remaining claims in this action are Pennsylvania state law negligence claims against the PSP, Abbott, and Adams.[7] Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim where it has dismissed all claims over which it has original

[7] Although Adams did not join the Commonwealth Defendants' Motion, the Court finds it appropriate to deny supplemental jurisdiction over Plaintiff's negligence claim against Adams as well.

jurisdiction. A district court's decision on whether to continue to retain jurisdiction over a sole remaining state law claim is wholly discretionary. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). Where, as here, the claim over which the district court has original jurisdiction is dismissed before trial, "the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added).

Whether a state law claim would be time-barred if filed in state court after federal dismissal is an important factor to consider in deciding whether to retain jurisdiction over supplemental claims. *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (internal citations omitted). Under Pennsylvania law, an action to recover damages for bodily injury or death caused by another's negligent act must be commenced within two years. 42 Pa. Cons. Stat. § 5524(2). Because the events giving rise to this action took place in March of 2023, the statute of limitations has run for Plaintiff's negligence claims if he were to bring them in Pennsylvania state court. However, the statute providing for supplemental jurisdiction ensures that a plaintiff has at least thirty days to refile their state law claims in state court following a dismissal under § 1367 by the district court. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."). As a result, Plaintiff may file his negligence claims in state court thirty days after this Court's dismissal. *See Hedges*, 204 F.3d at 123–24.

Finding that dismissal of the state law claims would not be unfair to the litigants, nor would it result in a waste of judicial resources, this Court will decline to exercise supplemental jurisdiction over the remaining claims.

## V. CONCLUSION

For the reasons discussed above, Plaintiff's § 1983 claims (Counts V and VI) are barred by Commonwealth Defendants' qualified immunity and thus dismissed with prejudice. With no federal claims remaining, this Court will decline to exercise supplemental jurisdiction over the remaining state law negligence claims (Counts I, III, and IV). Therefore, those claims are dismissed without prejudice. Plaintiff will have thirty days to refile his negligence claims in state court, if he so chooses. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

______________________________

**HODGE, KELLEY B., J.**